**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Advanced Business Services, LLC, | Case No. 11-13661 (KJC) |
| Debtor. | |

**DECLARATION OF NEIL WILLIAMS
IN SUPPORT OF FIRST DAY MOTIONS**

I, Neil Williams hereby declare the following:

1. I am the Managing Member of the Debtor. I am familiar with the Debtor's day-to-day operations, business and financial affairs, and I have personal knowledge of the facts set forth herein.

2. I submit this declaration (the "Declaration") in support of the Debtor's chapter 11 petition and "first day" motions and applications filed in the above-captioned case (the "Chapter 11 Case") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this Chapter 11 Case. Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor's history, operations and financial affairs. I am authorized to submit this Declaration and, if called to testify, I could and would testify competently to the facts set forth herein.

## I    THE DEBTOR'S BUSINESS

**A.    The Chapter 11 Filing**

3. On November 16, 2011 (the "Petition Date"), Advanced Business Services, LLC ("ABS", or, the "Debtor"), a Delaware limited liability company formed in 2008, filed a petition

1

for relief in this Court under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

4. The Debtor is operating its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**B. Corporate Structure**

5. The Debtor is a standalone limited liability company.

**C. Description of ABS' Business**

6. ABS is a Delaware limited liability company in good standing. ABS has two different lines of products that its customers can receive for a fixed monthly fee. ABS offers its business customers either an electronic fax and technical support bundle or an electronic fax and discount buying bundle. Both bundles are distinct and marketed separately to small businesses.

7. ABS' electronic fax service allows ABS customers to manage and store faxed documents on their computer and eliminates the need for the small business to have a separate fax line and a bulky fax machine. Customers can also fax documents from wherever they are, needing only access to email or a web browser. There is no limit to the amount of faxes that a customer can receive or send and there is no per-item charge for faxes.

8. A significant portion of the Debtor's customers are enrolled in the technical support product ("<u>Tech On Call</u>") which allows business customers to receive access to live computer technical support 24 hours a day, 7 days a week, 365 days per year. The Debtor provides access to contracted technicians who assist customers with troubleshooting and Windows-related errors, diagnose and help solve problems with computer hardware, install or de-install software, applications, drivers and other programs; help customers configure their printer, camera, PDA or wireless connection; and configure firewalls, repair Internet connections and help clean computers. The Debtor's customers also receive anti-virus software and anti-

malware products and may take advantage of the Debtor's offsite online storage which allows customers to securely store up to 2 gigabytes of documents. The Debtor competes with a number of other companies who offer this service, including AT&T, Tech Team, IYOGI, and Support.com, each of which offer a similar service for the same or a higher price on a per-unit basis.

9. A portion of ABS' customers are enrolled in the "Business Max" program which features electronic fax service with a discount business services program. The Business Max program provides customers with the ability to obtain discounted products and services that small businesses may need, including discounts on office supplies, printing, customer gifts, and others.

10. The Tech On Call and Business Max bundles are marketed separately to businesses and are sold for $49.95 per month. There is no long-term commitment and customers can cancel at any time.

11. The Debtor contracts with third parties, including the Non-Debtors, who specialize in providing such programs to provide the Tech On Call and Business Max. The Debtor pays a monthly fee to the third parties for each customer enrolled in the program for the services independent of usage.

12. As is common for a non-brick and mortar, service-oriented business, ABS outsources much of its business processing, utilizing third-party vendors to market, provision, and maintain its customer base. Indeed, ABS is required by the laws in several states to utilize independent third parties to conduct the authorization/verification process.

      i.      <u>The Marketing of ABS Services</u>

13. ABS only markets its services to businesses, and not to individual consumers. Because of the high cost involved in acquiring and servicing a customer, ABS does not break

even unless a customer is active for at least three months. ABS loses money if a customer cancels during a shorter time frame.

14. ABS primarily markets its services via telemarketing, which is performed by a third party, VICI Marketing, LLC ("Vici"). ABS' services are marketed by Vici and then verified by an independent third-party vendor, Verification Resources, LLC ("VRI").

15. During the time period in which ABS' services were marketed, at one time or another, several hundred individuals were involved in the sales and verification process. The telemarketing of ABS' services are conducted based on the training of an agent. Agents are trained to (i) clearly describe ABS' products; (ii) make sure that the potential customer is over 18 years of age and authorized to incur charges for the business; (iii) make sure that the customer understands ABS' terms and conditions for the service; (iv) that the ABS charges will be billed on their local phone bill; and (v) provide contact information should the customer have general questions or wish to cancel.

16. Agents are also provided with a general sales presentation. The sales presentations have varied over the time period in which ABS' services were sold. For example, ABS has offered various discount opportunities associated with the Business Max or Tech On Call bundles. Those discount opportunities have varied over time ranging from no offers to rebates on gasoline purchases to rebates on utilities, and other discounts. The dollar amount and time period of the rebate offers have also changed.

17. Because of the dynamics of the persons involved, each telephone call and actual sales presentation is unique. The telemarketing sales presentations serve as guideposts for sales agents to use to call prospective customers, and are not intended to be read verbatim. Indeed, sales agents are trained to engage potential customers in a dialog in order to encourage their

interest, as opposed to just selling. As a result, the conversation will vary depending on the mood of the participants, the tempo of the call, and the pacing of the call. For example, a potential customer that is in a hurry will receive an abbreviated sales presentation versus a potential customer that may be enjoying speaking to someone and want to know a significant amount about the services. Even though each call is unique, ABS' telemarketers must still disclose the reason for the call, provide a brief description of ABS' product and services, the cost of the product and services, how the product and services are billed, how the customer could contact the company, terms and conditions regarding the product and services, frequency of the billing, how to cancel the product and service, whether the recipient of the call is 18 years old or older, and whether the call recipient is authorized to make changes or incur charges on the account.

                ii.        <u>Order Verification</u>

18. If a business customer affirmatively decides it wants to purchase ABS' services, the customer's call is transferred to VRI, where the order is recorded.

19. The verification process begins with a conversation, and has varied over time. For example, some of the verifications have utilized a recording to detail the terms and conditions of the offer, others have utilized a live read. Naturally, where there is a live agent involved in reading the terms and asking questions, the length of time and speed in which they are read will vary depending on the verifier. Moreover, the speed, volume, and the exact content of the terms and conditions of the live read and the recording has varied over time.

20. While each verification is unique, each valid authorization must record details, including (i) the terms and conditions, including the cost; (ii) that the charges will be on their local phone bill; (iii) that the customer is an adult and has authority to order the service; (iv) the

5

1438088-5

customer's assent to the order; and (v) provision of contact information, should the customer have general questions or wish to cancel.

### iii. Quality Control

21. ABS takes numerous steps to make sure that its orders are legitimate and that the customers who order the service are advised as to the terms and conditions, and have the authority to authorize the service. In addition to training its sales representatives and using a recorded verification, ABS subjects all orders to numerous validity checks prior to activation and initial billing. Each recording is independently reviewed by a non-commissioned third-party who ensures that the customer agreed to the terms and conditions, and had the authority to authorize the service. In addition, 20% of all verified authorizations are randomly re-verified by a second non-commissioned third-party quality control company to ensure that the order is valid and complete. Any orders that do not pass these quality control measures are rejected and not processed as an order.

### iv. First Class Mail Welcome Package/Billing Cycles

22. Once the order passes validation and quality control, the customer is sent a welcome and fulfillment package via first class mail, which reiterates the terms and conditions of the offer, as well as provides the fulfillment materials for the service. The welcome package clearly reiterates the services being provided, along with the terms of the enrollment.

23. The billing record for a customer is held for five business days from the date of mailing of the welcome package to allow a customer to review the program and have an opportunity to cancel the service should the customer have changed its mind and no longer desire ABS' services. Customers who call during this time period are immediately canceled, with no billings.

1438088-5

24. While ABS believes that every charge it bills is authorized, customer service is the highest priority of the company, and it is ABS' practice that if a customer no longer wishes to use the service or complains in any way, ABS will simply cancel the account and refund the requested charges.

## II    PREPETITION DEBT

25. ABS has no secured debt and has unsecured trade debt on account of various vendor agreements.

## III    EVENTS LEADING TO THE CHAPTER 11 FILING

**A.    The Pre-Petition Litigation**

26. On September 4, 2009, The Dominic Corea Limited Partnership ("Corea") commenced an action against the Debtor and ILD Telecommunications, Inc. ("ILD") in the Superior Court of California, County of Los Angeles. The action was timely removed to the United States District Court for the Central District of California on October 14, 2009, Case No. 09-7433 (the "Pre-Petition Litigation"). Other vendors of the Debtor, namely (i) Vici, (ii) VRI, (iii) Solutions Marketing LLC ("Solutions") (iv) daData, Inc. ("DADATA"), and (v) ILD (Vici, VRI, Solutions, DADATA and ILD collectively referred to as the "Non-Debtors"), were added as co-defendants on August 3, 2010.

27. Corea operates a restaurant in Orange County, California, under the name Roma D'Italia. Corea was a customer of the Debtor who had been charged by the Debtor and paid for the Debtor's services for approximately sisxteen months. Although Corea made timely monthly payments to the Debtors for approximately sixteen months, Corea alleges that the Debtor, in conjunction with the Non-Debtors, billed Corea without authorization. Specifically, in the complaint, Corea brings claims against the Debtor and the Non-Debtors for unfair practices, violation of Business and Professions Code Section 17200, *et seq.*, violation of Public Utility

7

1438088-5

Code Section 2890, unjust enrichment, and injunctive relief. Corea contends that the Debtor and the Non-Debtors participated in and/or profited from the practice of including unauthorized charges on customers' telephone bills. Corea brought the case as a putative class action on behalf of itself and other California businesses similarly situated.

28. To date, Corea has been fully refunded for all charges made by the Debtor, and has not been able to find another customer similarly aggrieved to affirmatively join the Pre-Petition Litigation.

29. The Debtor and the Non-Debtors believe the allegations have no merit, and have filed responses to Corea's claims asserting unique, individual defenses, including: (i) Corea does not contend that it relied on any misrepresentation, so it lacks causation; (ii) Corea's claim that the employee who ordered the services lacked the authority to do so subjects it to an individual defense based on long-standing FCC decisional authority; (iii) Corea's payment of the clearly disclosed charges for seventeen months triggers application of the voluntary payment doctrine; and (iv) Corea's claim that its refund request was wrongfully denied centers on a case-specific failure of the ABS' customer service and Corea's manager to reach each other by telephone (although ABS left a cell phone voice mail attempting to do so), and not due to any uniform policy of denying refunds. Moreover, the Debtor believes that the issues in the Pre-Petition Litigation cannot be adjudicated on a class-wide basis since Corea's experience is so unique, and any determination of its rights would have no effect on the remainder of the class.

30. More than two years has passed since the Pre-Petition Litigation commenced and Corea has not yet sought class certification, and does not intend to do so until 2012. In the interim, Corea has amended its complaint twice (one time adding four new defendants), filed numerous discovery requests including hundreds of document demands, and conducted several

8
1438088-5

depositions. Third-party discovery was also conducted through various subpoenae and motion practice was conducted in the form of multiple motions to compel. The Debtor has already produced approximately 27,000 pages of documents to Corea, but Corea represented to the district court just last week that additional time is needed to complete outstanding discovery. Indeed, there are three depositions currently noticed and Corea served a round of new document demands, which total more than 200 requests, upon the Debtor and myself as the Debtor's principal.

31. These document requests are both extensive and extremely burdensome, and go beyond what is reasonable in a case such as the Pre-Petition Litigation. Should the Pre-Petition Litigation be allowed to continue against the Non-Debtors, the Debtor would need to devote substantial time and energy in order to comply with Corea's discovery requests to the Non-Debtors, as the Debtor herein is the "true" defendant in the Pre-Petition Litigation.

32. It is clear that Corea is stayed by section 362(a) of the Bankruptcy Code from attempting to collect prepetition debts from the Debtor in the Pre-Petition Ligitation. Corea likewise should be enjoined under the Bankruptcy Code and the Federal Rules of Civil Procedure, from attempting to collect from a Non-Debtor, because such efforts (i) will have the effect of action against the Debtor itself, and (ii) will cause significant interference with, and impairment of, the Debtor's efforts to reorganize. Accordingly, by motion filed contemporaneously herewith (the "Preliminary Injunction Motion"), the Debtor seeks an order (the "TRO") temporarily restraining all such efforts by Corea against the Non-Debtors.

33. Prepetition, the Debtor entered into service and/or processing agreements (together, the "Agreements") with certain of the Non-Debtors,[1] providing for, among other

---

[1] The indemnification provision between the Debtor and Solutions extends to Vici and VRI by virtue of their subcontracting agreements.

1438088-5

things, the indemnification of each of the Non-Debtors from and against any and all losses, claims, damages, liabilities and expenses, including reasonable attorney fees and litigation costs arising from the performance or non-performance of each of the Non-Debtors' obligations under their relevant Agreements.

34. Specifically, section 4.03 of the Agreement with DADATA provides as follows:

> ABS hereby agrees to indemnify DADATA and hold DADATA harmless from any and all claims, damages, liabilities, and expenses, including reasonable attorney fees and litigation costs arising from the performance or nonperformance of ABS' obligations under this Agreement including, but not limited to: (i) any negligence of ABS, its subcontractors or their respective employees; (ii) or any alleged or actual violations by ABS, its subcontractors or their respective employees, of any governmental laws, regulations or rules.

DADATA Agreement at ¶4.03. Section 4.02 of the Agreement with Solutions provides as follows:

> [ABS] agrees to indemnify, defend and hold harmless [Solutions] and their respective directors, officers, employees and agents from and against any and all looses [sic], damages, claims, suits, judgments, costs and expenses (including reasonable attorney's fees and costs of an investigation or action related thereto) ("Losses"), arising out of or related to (i) the breach by [ABS] or any of its subcontractors of any of its representations or warranties contained in this Agreement; (ii) the failure by [ABS] or any of its subcontractors to fully perform any [ABS] obligations hereunder; or (iii) the failure by [ABS] or any of its subcontractors to comply with any applicable laws, rules or regulation in connection with the performance of [ABS] obligations hereunder.

Solutions Agreement at ¶4.02(a). Article 14 of the Agreement with ILD provides as follows:

> [ABS] shall defend, indemnify and hold harmless ILD, its affiliates, their respective officers, directors, shareholders, employees, agents, successors and assigns, and each of them, from and against, any and all damages, losses, claims, liabilities, demands, charges, suits, penalties, costs or expenses, whether accrued, absolute, contingent, or otherwise, including but not limited to court costs and attorneys' fees, which any of the foregoing may incur or to which any of the foregoing may be

10

> subjected, arising out of or otherwise based upon any of the following:
>
> (a) Any breach or default by either party of or under any of the provisions of this Agreement or any of any other agreement or instrument to which either party or an affiliate of either party is a party or which is in favor of either party or an affiliate of either party (for purposes hereof, and "affiliate" of either party shall include any person or entity controlling, controlled by, or under common control with either party).
>
> (b) Claims of any third party or entity for liable [sic], slander, infringement of copyright, or unauthorized use of trademark, trade name, or service mark arising out of material, data, information, or other content transmitted by [ABS] over ILD's network, or
>
> (c) Claims of any third party or entity for damages, losses, or injuries arising out of any act or omission of [ABS] or its agents, servants, employees, contractors, or representatives,
>
> (d) Claims of any third party arising out of violation of telecommunications laws, including but not limited to slamming, cramming, violations of pay per call rules or other rules set forth by the FCC, FTC and any other state or federal regulatory body.

ILD Agreement at ¶ 14.

35. These potential indemnification costs, along with the legal fees and significant litigation costs are causing a liquidity crisis for the Debtor. Because the Debtor is obligated to indemnify and defend the Non-Debtors in the Pre-Petition Litigation, depending on the outcome of that litigation, the Pre-Petition Litigation is, in effect, an action against the Debtor itself and the continuation of that litigation at this time will cause significant interference with and impairment of the Debtor's efforts to reorganize.

36. Moreover, as discussed further below, as a result of the Prepetition Litigation, the Debtor's funds are being held by ILD, handicapping the Debtor from being able to operate and, more specifically, from searching out significant funding to resuscitate the Debtor and become a viable business.

11

37. Allowing Corea to proceed with litigation against the Non-Debtors would allow them to indirectly do what the Bankruptcy Code prohibits them from doing directly, and would place unduly burdensome discovery obligations on a bankrupt company which should be focusing its efforts on reorganization.

38. Additionally, in the Pre-Petition Litigation, as with all non-bankruptcy litigation, I, as the managing member of the Debtor, am regularly required to participate in the litigation in order to protect the Debtor's interests. My involvement in protracted and burdensome litigation will unquestionably detract from the Debtor's efforts to reorganize.

39. Moreover, if the Non-Bankruptcy Litigation proceeds without the Debtor, the Debtor could arguably be collaterally estopped from re-litigating critical factual and legal issues. If issues are decided in favor of the Non-Debtors, there is also the possibility that substantially identical issues will have to be re-litigated, creating a risk of duplication and inconsistent judgments.

40. Finally, if the Non-Bankruptcy Litigation proceeds against the Non-Debtors, a judgment against the Non-Debtors would impact the Debtor's estate because of the Debtor's potential indemnity obligations.

**B.   The ILD Reserve**

41. Pursuant to the Billing and Collections Agreement dated September 27, 2007 by and between the Debtor and ILD (the "<u>ILD Agreement</u>"), ILD collected money from various local exchange carriers (the "<u>LECs</u>") and remitted such funds to the Debtor. Prior to the commencement of the Pre-Petition Litigation, ILD collected approximately $747,000.00 from the LECs for the benefit of the Debtor. As a result of the Pre-Petition Litigation, and the indemnification provision in the ILD Agreement, ILD has been holding the $747,000.00 in escrow. These funds are rightly property of the Debtor, and upon a resolution or dismissal of the

Pre-Petition Litigation, the funds would be released to the Debtor. As noted above, such funds are integral to the Debtor's ability to successfully operate and reorganize.

42. If the Debtor were to recoup these funds, the Debtor would be able to reorganize the company by alleviating the liquidity crisis and enabling the Debtor to seek out potential investors to fund the business. Ultimately, this could revive the Debtor's operations and create a viable business.

## IV    FIRST DAY MOTION

43. To enable the Debtor to operate effectively and minimize any disruption caused by the commencement of this Chapter 11 Case, the Debtor has requested certain relief in the *Motion For An Order (I) Authorizing Debtor (A) To Continue Existing Cash Management System, (B) To Maintain Existing Bank Accounts And Business Forms, And (C) To Continue Intercompany Arrangements* (the "Cash Management Motion").[2] Prior to the Petition Date, in the ordinary course of business, the Debtor used a centralized bank account (the "Cash Management System") to efficiently collect, transfer, and distribute funds generated by business operations. I believe that the Debtor's estate would suffer immediate and irreparable harm absent the ability to immediately continue its bank account, as sought in the Cash Management Motion. In my opinion, approval of the relief requested in the Cash Management Motion will minimize disruptions to the Debtor's business operations, thereby preserving and maximizing the value of the Debtor's estate and assisting the Debtor in achieving a successful reorganization.

44. The Debtors' Cash Management System constitutes an ordinary course, essential business proactive that provides significant benefits to the Debtor including, inter alia, the ability to (i) control corporate funds, (ii) ensure the availability of funds when necessary, and (iii)

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the corresponding First Day Motion.

13

1438088-5

reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Any disruption of the Cash Management System could have a severe and adverse impact upon the Debtor's reorganization efforts.

45. In the Cash Management Motion, the Debtor also requests authorization to maintain and utilize their current Bank Account and their existing Business Forms, in order to prevent (i) disruption to the Debtor's ordinary financial affairs and business operations, (ii) delay in the administration of the Debtor's estate, and (iii) cost to the estate to set up new systems, open new accounts, print new business forms, and print new checks. Accordingly, authorization to maintain existing Business Accounts and Business Forms is appropriate in this chapter 11 case.

46. The Debtor believes it is in full compliance with Bankruptcy code section 345(b).

47. Thus, by this Motion, the Debtor seeks authority to continue to utilize its Cash Management System in the ordinary course of its business.

1438088-5

# V    CONCLUSION

48.    In sum, based upon my familiarity with the Debtor and its operations, I believe that the facts noted in this Declaration and the First Day Motion are true and correct to the best of my knowledge, information and belief. I also believe that the relief requested therein is necessary for the Debtors to successfully restructure their business and preserve their going-concern value. Accordingly, I respectfully request on behalf of the Debtor that the Court grant the relief requested in the First Day Motion as being in the best interests of the Debtor, its estate, and creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 14, 2011

/s/ Neil Williams
NEIL WILLIAMS
Managing Member of Advanced Business Services, LLC